1

2

3

4

5

6

7

8              IN THE UNITED STATES DISTRICT COURT

9              FOR THE EASTERN DISTRICT OF CALIFORNIA

10   DALE L. MARK,

11              Petitioner,              No. CIV S-09-CV-1260 CHS P

12      vs.

13   BEN CURRY,

14              Respondent.              <u>ORDER</u>

15   _____/

16                          **I.  INTRODUCTION**

17              Petitioner, Dale L. Mark, is a state prisoner proceeding pro se with a petition for writ

18   of habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner is currently serving a determinate term

19   of twelve years and eight months following his convictions by jury trial in the Sacramento County

20   Superior Court, Case Nos. 05F08317 and 05F08318, for two counts of grand theft and two counts

21   of second degree burglary with penalty enhancements for prior terms of incarceration.  Petitioner

22   presents various claims challenging the constitutionality of his conviction.

23                          **II.  CLAIMS**

24              Petitioner presents several grounds for relief in his pending petition.  Specifically,

25   the claims are as follow:

26              (1)      Material and prejudicial testimonial evidence was introduced

                                            1

against him without opportunity for cross-examination, in violation of his federal right under the confrontation clause.

(2)   The prosecutor committed prejudicial misconduct by disparaging defense counsel in front of the jury and insinuating that she did not believe her client's defense.

(3)   The trial court violated his right to a jury trial by imposing the upper term sentence based on facts that were neither found by a jury nor admitted by Petitioner, in violation of his Sixth Amendment right to a jury trial.

Both parties have consented to the jurisdiction of a United States Magistrate Judge to conduct all proceedings in this case, including trial and entry of final judgment, with direct review by the Ninth Circuit Court of Appeals, pursuant to 28 U.S.C. § 636(c)(1).

## III.  BACKGROUND

## A. FACTUAL AND PROCEDURAL BACKGROUND

The basic facts of Petitioner's crime were summarized in the unpublished opinion of the California Court of Appeal, Third Appellate District, as follow:

**DeVon's Jeweler's Incident**

On the morning of August 12, 2005, a man entered the DeVon's Jewelers located at Arden Fair Mall.  He asked a salesperson whether the store had any platinum watches.  Tom Carson, the manager of the jewelry store, told the man the store did not have any such watches and the man left the store.

A few minutes later, the man came back into the store.  Carson showed him the store's Rolex watches.  First, Carson showed the man a stainless steel watch.  Then, he showed the man a solid, rose gold, Rolex watch valued at a little over $19,000.  The man tried the gold watch on his wrist and wanted to look in the mirror that was two or three feet away.  A salesperson asked Carson a question and as Carson turned his head, the man ran out the door with the watch still on his wrist and without paying for it.

Carson ran after the man and chased him through the mall, through the parking lot and to the adjacent street.  He saw the man jump into the back seat of a dark blue sedan.  Carson could not see the car's license plate, but saw it leave in the direction of the freeway.

Approximately three weeks later, Carson was shown a photo lineup. Carson took 60 to 90 seconds to view the lineup and then picked out defendant's photograph, saying he though defendant was the man

who had stolen the Rolex watch. Carson also identified defendant at trial as the man who had taken the watch. The store's surveillance video of the incident was played for the jury. We have reviewed the surveillance video, which shows a clear, albeit very brief, view of the man entering the store.

Fingerprints taken from the watch display counters came back negative to defendant. However, the prosecutor argued the surveillance tape from DeVon's Jewelers showed defendant did not touch the counter.

**Grebitus & Sons Jewelers Incident**

About 4:00 p.m. on August 25, 2005, a man entered Grebitus and Sons Jewelers located at the downtown plaza in Sacramento. Clifford Krayenbuhl, a salesperson, assisted the man, answering his questions about Rolex watch models and costs. In addition to Krayenbuhl, another employee of Grebitus & Sons, Judith Gaudette, noticed and watched the man as he was in the store. The man seemed fidgety and nervous. Krayenbuhl and Gaudette estimated the man was in the store between 15 and 25 minutes.

Krayenbuhl and Gaudette testified the same man returned to the jewelry store around 10:30 a.m. the next day. Krayenbuhl went to assist him again. Eventually, Krayenbuhl took a steel and gold Rolex watch out of the case to show the man. Then he showed the man a solid white gold model, valued at approximately $20,000. The man tried it on his wrist. Krayenbuhl took out a matching ladies' watch, valued around $15,000. The man quickly stood up, grabbed the ladies' watch from Krayenbuhl's hand and ran out of the store, still wearing the man's watch on his wrist.

Krayenbuhl leapt over the counter, threw off his coat and ran after the man. The man went downstairs to the street and then west on L Street. When Krayenbuhl was within a quarter block of the man, the man noticed him coming. The man turned and ran north on 5th Street. The man tried to cross the street but was blocked by traffic. At this point, a car pulled up to the curb by Krayenbuhl and someone asked him what was going on. Krayenbuhl told the couple inside the car that a man had just stolen watches from the jewelry store. Krayenbuhl asked the couple to pursue the man. Krayenbuhl watched the couple drive after the man up the street, blocking the man from crossing the street, but Krayenbuhl lost sight of them at the intersection. Krayenbuhl returned to the store to speak to police and review the store's surveillance tapes. The surveillance tapes were played for the jury at trial. Our review of the tapes indicates a clear view of the same man entering the jewelry store both dates and running out of the store on the second day, quickly followed by a man who is presumably Krayenbuhl.

The Sacramento Police Department received a 911 call on August 26,

2005, about 10:58 a.m. from someone identifying herself as Margo Pumar.  Pumar told the 911 operator that she and her husband were just driving in downtown Sacramento when they witnessed a man chasing a Black man away from the shopping mall at 5th and L Streets.  The man said the Black man had just stolen a bunch of Rolexes.  They followed the Black man and saw him get into a silver Nissan Sentra.  They saw him as he got onto the freeway going northbound. They just got off the freeway at Richards Boulevard, but had taken down the license plate number of the Sentra, which Pumar then provided.  Pumar said it was possible she could identify the man because they drove up to him and honked so that he turned and looked at them.  Pumar did not testify at trial.

It was later determined the license plate number belonged to a Sentra rented to defendant a few days earlier by the Enterprise Rent-A-Car located in San Francisco.  The rental agency identified defendant at trial as the man who rented the car.

At trial, Gaudette recognized the man on the surveillance tapes from Grebitus & Sons as the man who came into the store late on August 25 and then again the next morning when he took the watches.  She also identified defendant in court as the thief who took the watches on August 26, saying she was very certain of her identification.

Fingerprint lifts from the inside of the store doors came back negative to defendant.  The prosecutor argued the surveillance video showed defendant did not place his hand on the door in the position of the print lifted from the door.

(Lodged Doc. 3 at 2-6).

Following a jury trial, Petitioner was convicted of grand theft and second degree burglary of Devon's Jewelers (counts one and two, respectively), as well as grand theft and second degree burglary of Grebitus & Sons Jewelers (counts three and four, respectively).  In addition, the trial court found true allegations that Petitioner had served nine prior prison terms.  He was sentenced to an aggregate term of twelve years and eight months.[1]

Petitioner  appealed his convictions to the California Court of Appeal, Third

---

[1] More specifically, the trial court sentenced Petitioner to the upper term of three years on count one; the middle term of two years on count two, stayed pursuant to section 654 of the California Penal Code; eight months, one-third of the middle term on count three; and the middle term of two years on count four, stayed pursuant to section 654 of the California Penal Code.  In addition, Petitioner was sentenced to one additional year on each of nine prior convictions found true by the trial court.

Appellate District.  The court affirmed Petitioner's convictions with a reasoned opinion on May 7, 2008.  (Lodged Doc. 3).  Petitioner then filed a petition for review of the appellate court's decision in the California Supreme Court.  The court denied the petition without comment on July 16, 2008. Petitioner filed this federal petition on May 7, 2009.  Respondent filed its answer on December 7, 2009, and Petitioner filed his traverse on February 8, 2010.

## IV.  APPLICABLE STANDARD OF HABEAS CORPUS REVIEW

This case is governed by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment on April 24, 1996.  *Lindh v. Murphy*, 521 U.S. 320, 326 (1997); *Jeffries v. Wood*, 114 F.3d 1484, 1499 (9th Cir. 1997).  Under AEDPA, an application for a writ of habeas corpus by a person in custody under a judgment of a state court may be granted only for violations of the Constitution or laws of the United States.  28 U.S.C. § 2254(a); *Williams v. Taylor*, 529 U.S. 362, 375 n. 7 (2000).  Federal habeas corpus relief is not available for any claim decided on the merits in state court proceedings unless the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).  Although "AEDPA does not require a federal habeas court to adopt any one methodology," *Lockyer v. Andrade*, 538 U.S. 63, 71 (2003), there are certain principles which guide its application.

First, AEDPA establishes a "highly deferential standard for evaluating state-court rulings."  *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002).  Accordingly, when determining whether the law applied to a particular claim by a state court was contrary to or an unreasonable application of "clearly established federal law," a federal court must review the last reasoned state court decision.  *Robinson v. Ignacio*, 360 F.3d 1044, 1055 (9th Cir. 2004); Avila v. Galaza, 297 F.3d 911,

918 (9th Cir. 2002). Provided that the state court adjudicated petitioner's claims on the merits, its decision is entitled to deference, no matter how brief. *Lockyer*, 538 U.S. at 76; *Downs v. Hoyt*, 232 F.3d 1031, 1035 (9th Cir. 2000). Conversely, when it is clear that a state court has not reached the merits of a petitioner's claim, or has denied the claim on procedural grounds, AEDPA's deferential standard does not apply and a federal court must review the claim *de novo*. *Nulph v. Cook*, 333 F.3d 1052, 1056 (9th Cir. 2003); *Pirtle v. Morgan*, 313 F.3d 1160, 1167 (9th Cir. 2002).

Second, "AEDPA's, 'clearly established Federal law' requirement limits the area of law on which a habeas court may rely to those constitutional principles enunciated in U.S. Supreme Court decisions." *Robinson*, 360 F.3d at 155-56 (citing *Williams*, 529 U.S. at 381). In other words, "clearly established Federal law" will be " the governing legal principle or principles set forth by [the U.S. Supreme] Court at the time a state court renders its decision." *Lockyer*, 538 U.S. at 64. It is appropriate, however, to examine lower court decisions when determining what law has been "clearly established" by the Supreme Court and the reasonableness of a particular application of that law. *See Duhaime v. Ducharme*, 200 F.3d 597, 598 (9th Cir. 2000).

Third, the "contrary to" and "unreasonable application" clauses of § 2254(d)(1) have "independent meanings." *Bell v. Cone*, 535 U.S. 685, 694 (2002). Under the "contrary to" clause, a federal court may grant a writ of habeas corpus only if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law, or if the state court decides the case differently than the Supreme Court has on a set of materially indistinguishable facts. *Williams*, 529 U.S. at 405. It is not necessary for the state court to cite or even to be aware of the controlling federal authorities "so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early v. Packer*, 537 U.S. 3, 8 (2002). Moreover, a state court opinion need not contain "a formulary statement" of federal law, but the fair import of its conclusion must be consistent with federal law. *Id*.

Under the "unreasonable application" clause, the court may grant relief "if the state court correctly identifies the governing legal principle...but unreasonably applies it to the facts of

1    the particular case." *Bell*, 535 U.S. at 694.  As the Supreme Court has emphasized, a court may not

2    issue the writ "simply because that court concludes in its independent judgment that the relevant

3    state-court decision applied clearly established federal law erroneously or incorrectly." *Williams*,

4    529 U.S. at 410.  Thus, the focus is on "whether the state court's application of clearly established

5    federal law is *objectively* unreasonable." *Bell*, 535 U.S. at 694 (emphasis added).

6            Finally, the petitioner bears the burden of demonstrating that the state court's

7    decision was either contrary to or an unreasonable application of federal law.  *Woodford*, 537 U.S.

8    at 24 ; *Baylor v. Estelle*, 94 F.3d 1321, 1325 (9th Cir. 1996).

9                                    **V.  DISCUSSION**

10   **A.  CONFRONTATION CLAUSE**

11           Petitioner claims his rights to due process and to confront the witnesses against him

12   were violated when the trial court admitted into evidence hearsay statements made by Margo Pumar

13   to a 911 dispatcher during an emergency telephone call placed by Ms. Pumar regarding her

14   observations of Grebitus & Sons employee Krayenbuhl's chase after a man in the K Street Mall area

15   of downtown Sacramento.  According to Petitioner, admission of Ms. Pumar's statements violated

16   his right to confront witnesses against him because her statements constituted testimonial evidence

17   and she was unavailable for cross-examination at trial.

18           Prior to trial, the prosecution made a motion to introduce the tape of Ms. Pumar's 911

19   call, which was opposed by the defense.[2]  Following a hearing on the matter, the trial judge

20   determined that the substance of the call was non-testimonial and, subject to establishment by the

21   prosecution of a proper evidentiary foundation, would be admissible at trial pursuant to CAL. EVID.

22

23

24   _____

25          [2] During the morning session of trial on August 24, 2006, defense counsel represented to the
     court that Ms. Pumar was in New York and had not yet been subpoenaed.  (Lodged Doc. 9 at 115).
26   The prosecutor then indicated that efforts were still being made to obtain Ms. Pumar as a trial
     witness.  *Id.*

1    CODE § 1280,[3] the business records exception to the hearsay rule, and CAL. EVID. CODE § 1240,[4] the

2    spontaneous declaration exception to the hearsay rule. (Lodged Doc. 9 at 119-124). The tape of Ms.

3    Pumar's 911 call was subsequently introduced to the jury via the testimony of Brenda Holloway,

4    the assistant manager of communications for the Sacramento Police Department, despite continuing

5    objection from defense counsel. (Lodged Doc. 9 at 269-274). Ms. Holloway testified that the

6    communications division of the police department is responsible for taking 911 calls. The calls are

7    recorded, stored temporarily within a master computer, and then transferred to a disk for permanent

8    storage in a locked drawer in the clerical office. A transcript of the 911 call is contained in the

9    record:

10            OPERATOR:  Sacramento Police Department. Carol speaking. May
                                   I help you?

11

12            M. PUMAR:  Hi. Um, my husband and I were just driving in
                                  downtown and we witnessed this, uh, man chasing,
                                  um, a Black man away from, I think it was like, uh

13                                   one - - the shopping mall that's on, um, 5th and L, I

14

15    [3] Section 1280 of the California Evidence Code provides in relevant part:

16       Evidence of a writing made as a record of an act, condition, or event is not made
       inadmissible by the hearsay rule when offered in any civil or criminal proceeding to

17       prove the act, condition, or event if all of the following applies:

18            (a)  The writing was made by and within the scope of duty of a public
                  employee.

19

20            (b)  The writing was made at or near the time of the act, condition, or
                  event.

21            (c)  The sources of information and method and time of preparation were
                  such as to indicate its trustworthiness.

22

23    [4] Section 1240 of the California Evidence Code provides in relevant part:

      Evidence of a statement is not made inadmissible by the hearsay rule if the statement:

24

25            (a)  Purports to narrate, describe, or explain an act, condition, or event
                  perceived by the declarant; and

26            (b)  Was made spontaneously while the declarant was under the stress of
                  excitement caused by such perception.

think.  Somewhere around there.  Wherever that shopping center is.  And, um, obviously it looked like it was pretty, um, hot pursuit.  So we kind of, um, asked the guy - -

OPERATOR:  Like - -

M. PUMAR:  - - who's following him, and he said that he was, um, - - he said the - - the Black man had just, um, stolen a bunch of Rolexes.  And so we followed th, um, - - the young, Black man.  He's probably in his twenties, um, until he got in a car.  And then we saw him as he just got on, um, Northbound 5 at J Street.  He was just, um, at, uh, - - uh, we were just - - we just got off at Richard's Boulevard, but we got his license plate number.

OPERATOR:  Go ahead with that.

M. PUMAR:  It's, uh, - - it's 5KMZ522.  It's a Nissan Sentra, silver.

OPERATOR:  Can you I.D. him?

M. PUMAR:  Um, it's possible.  I mean, he's - - he - - we - - I - - I - - I saw him running away so I went - - I - - I drove up to him and honked my horn really loudly so that he turned around and he looked at us.  And then we kept on honking the horn.  I mean, I pretty much laid on my horn because I - - I - - obviously he looked like he'd done something wrong, so I didn't want him to get away.  Um, so we saw his face briefly as he turned around.  Um, he was wearing all-black, probably like 5'8", 5'10".

OPERATOR:  Okay.  Um, what, uh, - - what is your name?

M. PUMAR:  Um, my name is Margo Pumar.

OPERATOR:  Mar - - Margo?

M. PUMAR:  Uh-huh.

OPERATOR:  Last name?

M. PUMAR:  Pumar.  That's P as in Paul, U-M-A-R.

OPERATOR:  Okay.  And can I have a cell phone number for you, Margo?

M. PUMAR:  Yeah.  It's - - it's this one.  It's (916).

1     OPERATOR:        Uh-huh.

2     M. PUMAR:  802.

3     OPERATOR: Uh-huh.

4     M. PUMAR.  7386.

5     OPERATOR: Okay.  I'll get this information to the officers that are
             on the call.

6     M. PUMAR:  Okay.

7     OPERATOR: Thank you for calling it in.

8     M. PUMAR:   Oh, you're welcome.

9     OPERATOR: All right.  Bye, bye.

10    M. PUMAR:   Okay.  Bye, bye.

11    (Lodged Doc. 6 at 323-25).

12          The Sixth Amendment to the United States Constitution, applicable to the states

13    through the Due Process Clause of the Fourteenth Amendment, grants a criminal defendant the right

14    to confront and cross-examine the witnesses against him.  *See Pointer v. Texas*, 380 U.S. 400, 403

15    (1965).  In 2004, the United States Supreme Court held that the Sixth Amendment's Confrontation

16    Clause is violated by the admission into evidence of out-of-court statements which are testimonial

17    in nature unless the witness is unavailable and the defendant had a prior opportunity to cross-

18    examine the witness.  *Crawford v. Washington*, 541 U.S. 36, 68 (2004).  The Court rejected such

19    statements as exceptions to the Confrontation Clause, regardless of their demonstrated reliability,

20    on the grounds that "dispensing with confrontation because testimony is obviously reliable is akin

21    to dispensing with a jury because a defendant is obviously guilty.  This is not what the Sixth

22    Amendment proscribes."  *Id*. at 62.

23          While the *Crawford* Court specifically left "for another day any effort to spell out a

24    comprehensive definition of 'testimonial,'" it gave examples.  "Whatever else the term covers, it

25    applies at minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former

26

trial; and to police interrogations." *Id.* at 68.  The Supreme Court later elaborated on its holding in *Crawford* in the context of a phone call placed to a 911 operator during an ongoing emergency, exploring the parameter of statements which were "testimonial" in nature.  *See Davis v. Washington*, 547 U.S. 813 (2006).  The Court observed:

> Statements are non[-]testimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency.  They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

*Id.* at 822.  Earlier this year, the Court further clarified that "[t]he existence of an emergency or the parties' perception that an emergency is ongoing is among the most important circumstances that courts must take into account in determining whether an interrogation is testimonial because statements made to assist police in addressing an ongoing emergency presumably lack the testimonial purpose that would subject them to the requirement of confrontation."  *Michigan v. Bryant*, 131 S.Ct. 1143, 1162 (2011).  Thus, it is clear that for Confrontation Clause purposes, statements must be evaluated in the context of the circumstances under which they are made.

The rule proscribed by *Crawford*, of course, applies only to hearsay statements that are testimonial in nature and, therefore, does not prohibit admission of non-testimonial hearsay statements.  *See Giles v. California*, 554 U.S. 353, 376 (2008) ("[O]nly *testimonial* statements are excluded by the Confrontation Clause.") (emphasis in original); *Whorton v. Bockting*, 549 U.S. 406, 420 (2007) ("[T]he Confrontation Clause has no application to" an "out-of-court non[-]testimonial statement.").

On appeal, Petitioner argued that Ms. Pumar's statements to the 911 operator were testimonial because they were not made under the stress of an ongoing emergency, but instead to establish or prove past events relevant later to criminal prosecution.  The California Court of Appeal, Third Appellate District, disagreed and rejected Petitioner's claim on the merits, explaining its

reasoning as follows:

> Prior to trial, the prosecution sought a ruling allowing the admission of the 911 call made by Margo Pumar.  Defendant objected to the admission of the transcript of the call on the grounds that it violated his constitutional confrontation rights under *Crawford*, *supra*, 541 U.S. 36 [158 L.Ed. 177], since Pumar was not available as a witness. Finding Pumar's statements were not testimonial because they were made to law enforcement under the stress and excitement of reporting the situation to assist in an ongoing emergency, the trial court ruled admission of the 911 call did not violate *Crawford* pursuant to *Davis v. Washington* (2006) 547 u.s. 813 [165 L.Ed.2d 224] (*Davis*).

> On appeal, defendant again claims the statements were testimonial and, therefore, admission violated his confrontation rights under *Crawford*.  We disagree, but to the extent Pumar's statements could be viewed as violative of *Crawford*, we find the admission of the statements to have been harmless beyond a reasonable doubt.

> The Sixth Amendment to the United States Constitution dictates that in all "criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him."  (U.S. Const., 6th Amend.; *Pointer v. Texas* (1965) 380 U.S. 400, 406 [13 L.Ed.2d 923, 928] [applying the Sixth Amendment to the States], superseded by statute as stated in *United States v. Silverman* (6th Cir. 1991) 945 F.2d 1337.)  The United States Supreme Court held in *Crawford* that this clause bars "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." (*Crawford, supra,* 541 U.S. at pp.53-54 [158 L.Ed.2d 194].)

> In *Davis*, *supra*, 547 U.S. 813 [165 L.Ed.2d 224], the United States Supreme Court clarified what constitutes "testimonial hearsay" that violates the right of confrontation within the meaning of *Crawford* in the context of a case involving a 911 call.  In *Davis*, the victim/witness McCottry called 911 during a domestic dispute, telling the operator "He's here jumpin' on me again." (*Davis, supra,* at p. 817 [165 L.Ed.2d at p. 234].)  In responding to the operator's questions, McCottry said the attacker's name was Davis and he was hitting her with his fists.  As the conversation continued, McCottry said Davis had run out the door.  The operator told McCottry to stop talking and answer some questions.  In response to the operator's questions, McCottry gave Davis's date of birth and said Davis had come to get his belongings because she was moving. (*Id.* at pp. 817-818 [165 L.Ed.2d at pp. 234-235].)  McCottry did not testify at trial. The 911 tape was played for the jury, and Davis was convicted of violating a no-contact order.  (*Id.* at p. 818 [165 L.Ed.2d at p. 235].)

> The Supreme Court found McCottry's statements identifying Davis as her assailant were not testimonial.  The court reasoned: "Statements are nontestimonial when made in the course of police

interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency.  They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later prosecution." (*Davis, supra,* 547 U.S. at p. 822 [165 L.Ed.2d at p. 237], fn. omitted.)

In concluding McCottry's identification statements were not testimonial, the court particularly focused on the fact that McCottry was speaking about events as they actually happened; she was facing an ongoing emergency; the questions asked and answered were necessary to resolve the emergency rather than simply to learn what had happened in the past; and finally, McCottry's frantic answers were provided over the phone in an environment that was not tranquil or even safe, rather than in a formal interrogation setting.  (*Davis, supra,* 547 U.S. at pp. 826-827 [165 L.Ed.2d at p. 240].)

However, the court also noted it was not asked to consider whether the statements following McCottry's identification of Davis were testimonial.  The court observed that a conversation that begins as an interrogation to determine the need for emergency assistance can evolve into testimonial statements.  As the court noted: "In this case, for example, after the operator gained the information needed to address the exigency of the moment, the emergency appears to have ended (when Davis drove away from the premises).  The operator then told McCottry to be quiet, and proceeded to pose a battery of questions.  It could readily be maintained that, from that point on, McCottry's statements were testimonial, not unlike the 'structured police questioning' that occurred in *Crawford . . . .*" (*Davis, supra,* 547 U.S. at pp. 828-829 [165 L.Ed.2d at p. 241].)[FN2] The court proposed such testimonial statements could be redacted and in any event, noted defendant did not challenge the Washington Supreme Court's finding that any error in the admission of the testimonial statements was harmless beyond a reasonable doubt.  (*Ibid.*)

> FN2.   In a companion case to *Davis*, *Hammon v. Indiana*, the Supreme Court considered statements the victim made in a written affidavit to police officers who were investigating a domestic disturbance that had already run its course by the time the officers arrived on the scene.  (*Davis, supra,* 547 U.S. 813 [165 L.Ed.2d at pp. 241-243].)  Finding the statements comparable to those at issue in *Crawford*, the court determined they were testimonial because they were generated during an investigation aimed at finding out "'what happened,'" as opposed to "'what is happening.'" (547 U.S. at p. 829 [165 L.Ed.2d at p. 242].)

The California Supreme Court has derived several basic principles

from the United States Supreme Court's discussion in *Davis*. "First, . . . , the confrontation clause is concerned solely with hearsay statements that are testimonial, in that they are out-of-court analogs, in purpose and form, of the testimony given by witnesses at trial. Second, though a statement need not be sworn under oath to be testimonial, it must have occurred under circumstances that impaired, to some degree, the formality and solemnity characteristic of testimony.  Third, the statement must have been given and taken primarily for the purpose ascribed to testimony--to establish or prove some past fact for possible use in a criminal trial.  Fourth, the primary purpose for which a statement was given and taken is to be determined 'objectively,' considering all the circumstances that might reasonably bear on the intent of the participants in the conversation. Fifth, sufficient formality and solemnity are present when, in a nonemergency situation, on responds to questioning by law enforcement officials, where deliberate falsehoods might be criminal offenses.  Sixth, statements elicited by law enforcement officials are not testimonial if the primary purpose in giving and receiving them is to deal with a contemporaneous emergency, rather than to produce evidence about past events for possible use at a criminal trial." (*People v. Cage* (2007) 40 Cal.4th 965, 984 (*Cage*, fns. omitted.)

Under these principles, the California Supreme Court in *Cage* concluded the victim's response to an officer's questioning while the victim was in the hospital waiting room was testimonial.  By that time, the incident that had caused the victim's injury was over for more than an hour, the alleged assailant and victim were geographically separated, the victim was in no danger of further violence as to which contemporaneous police intervention might be required, and there was no evidence the primary purpose of the conversation was [to] facilitate the emergency treatment of the victim.  (*Cage*, *supra*, 40 Cal.4th at p. 985.)  In contrast, the victim's statements to a treating surgeon at the hospital were not testimonial as the primary purpose was not to establish or prove past facts for possible criminal use, but to help the physician deal with the immediate medical situation.  (*Id.* at pp. 972, 986.)  The court determined admission of the victim's statements to the officer was harmless beyond a reasonable doubt.  (*Id.* at p. 991 [*Chapman v. California* (1967) 386 U.S. 18 [17 L.Ed.2d 705] standard applicable to review of *Crawford* error].(

Applying these principles to this case requires a careful consideration of Pumar's 911 call . . . .

. . . .

We conclude Pumar's statements, when viewed objectively, were not for the primary purpose of establishing or proving past facts for possible use in a criminal trial, but were primarily given, by way of a 911 call, to assist law enforcement in dealing with a contemporaneous emergency, the continuing escape of defendant

from the scene of his theft.  (*Cage*, *supra*, 40 Cal.4th at p. 984.) Although Pumar was not the victim of defendant's crimes, or a percipient witness to the actual theft, circumstantial evidence indicates she was a percipient witness to Krayenbuhl's chase of the thief.  She and her husband took up the chase where Krayenbuhl left off, following defendant as he got in a car and then following the car as it traveled north on the freeway.  She called 911 to relay her observations to the police to assist them in responding to the location of the thief thereby preventing his further escape.  Although some of Pumar's statements related past events - she and her husband saw the chase, they stopped and asked what was happening, they were told of the theft, they followed the man as he got into a car that proceeded onto the freeway - such details were given as context explaining the reason for the call, which related to an ongoing emergency since defendant had not yet been apprehended.  Pumar's identification of the model, color and license plate number of the car was necessary for the police to respond to the area to look for defendant.  As Pumar's statements were made to enable police to meet an ongoing emergency, specifically defendant's flight from the scene of a crime, they were not testimonial.  The admission of such statements at trial did not violate defendant's confrontation rights under *Crawford*.

(Lodged Doc. 3 at 6-14).

For the reasons cited by the state appellate court, the statements made by Ms. Pumar during the 911 call were not testimonial and, thus, were not subject to the Confrontation Clause. Specifically, the statements made by Ms. Pumar and the questions asked of her by the 911 operator were directed towards assisting police to investigate an ongoing emergency situation.  As noted by the appellate court, the emergency situation was created by Petitioner's theft of the Rolex watches from Grebitus & Sons Jewelers, his flight from the jewelry store, and his pursuit by a jewelry store employee, Mr. Krayenbuhl.  Ms. Pumar observed the chase of Petitioner by Mr. Krayenbuhl, and picked up the chase by car where Mr. Krayenbuhl left off on foot, honking at Petitioner in order to observe his face, and following his vehicle onto the freeway in order to obtain his license plate number. Information conveyed during the telephone call by Ms. Pumar related relevant information to the 911 operator in order to provide the context in which the call was being made, as well as to assist the police in preventing the escape of Petitioner from the scene of his theft.  On the record in this case, the state court's decision is not contrary to or an unreasonable application of clearly established federal law.

Even assuming that Petitioner's right to confrontation was violated by his inability to cross-examine Ms. Pumar at trial regarding her statements, "Confrontation Clause errors are subject to harmless error analysis." *Slovik v. Yates*, 556 F.3d 747, 755 (9th Cir. 2009). *See also Winzer v. Hall*, 494 F.3d 1192, 1201 (9th Cir. 2007) ("Violation of the Confrontation Clause is trial error subject to harmless-error analysis . . . because its effect can be 'quantitatively assessed in the context of other evidence presented' to the jury."); *United States v. Nielsen*, 371 F.3d 574, 581 (9th Cir. 2004). In the context of a habeas corpus petition, relief may not be granted based on a Confrontation Clause violation absent a demonstration that the admission of the offending evidence violated *Brecht v. Abrahamson* in that it had a substantial and injurious effect or influence in determining the jury's verdict. *Hernandez v. Small*, 282 F.3d 1132, 1144 (9th Cir. 2002) (citing *Brecht v. Abrahamson, 507* U.S. 619, 637 (1993). In other words, Petitioner is not entitled to habeas corpus relief unless he can demonstrate he was prejudiced by the allegedly improper admission of Ms. Pumar's 911 call. *See id.*

Here, the California Court of Appeal, Third Appellate District concluded that even if Ms. Pumar's statements were improperly admitted by the trial court, any error was harmless in light of the overwhelming evidence introduced against Petitioner at trial, explaining as follows:

> However, even if we were to conclude Pumar's statements were testimonial,[FN3] we would find the trial court's admission of such statements in violation of *Crawford* harmless beyond a reasonable doubt. As to the DeVon's Jewelers incident, Carson positively identified defendant in a photo lineup and at trial as the man who had taken the Rolex watch from the store. The store's surveillance video of the incident was played for the jury. It showed a clear facial view of the man who entered the store, which the jury could determine to be defendant. As to the Grebitus & Sons incident, Krayenbuhl testified the man who came in the store the afternoon before the theft was the same man who came in the next day and stole the Rolex watches. Moreover, Gaudette testified she noticed and observed defendant in the store the afternoon before the theft, she recognized defendant the next day when he returned to the store, she identified defendant on the surveillance tapes and identified him at trial. She was "very certain" of her identification of defendant. Again, the surveillance tapes were played for the jury. The tapes show clear facial views of the man entering the store, which the jury could determine to be defendant. In light of this strong evidence, any

1

*Crawford* error was harmless beyond a reasonable doubt.

2

FN3.  Pumar's statements are ambiguous as to whether the call was made while Pumar and her husband were still following defendant as they all got off the freeway at Richards Boulevard or whether only Pumar and her husband got off the freeway at Richards Boulevard and then Pumar subsequently made the call.  If the evidence clearly indicated the latter, it could be reasoned the immediate emergency was over if defendant had already completed his escape.  Arguably, then the primary purpose of Pumar's statements in the 911 call would have been to report past observed facts for possible use in a criminal trial.

3

4

5

6

7

8

(Lodged Doc. 3 at 14-15).

9

In order to grant habeas corpus relief in a case such as this one, where a state court

10

has determined that a possible constitutional error was harmless, a reviewing court must determine

11

both that:  (1) the state court's decision was contrary to" or an "unreasonable application" of federal

12

law with respect to harmless error, and (2) the petitioner suffered prejudice under *Brecht* as a result

13

of the constitutional error.  *Mitchell v. Esparza*, 540 U.S. 12, 17-18 (2003) (when a state court

14

determines that a constitutional error is harmless, a federal court may not award habeas corpus relief

15

under section 2254 unless the harmlessness determination itself was unreasonable).

16

On the facts in this case, it cannot be said that the state appellate court unreasonably

17

applied the harmless error standard.  As the state court explained, evidence of Petitioner's guilt was

18

considerable.  Review of the trial record reveals the state appellate court's summation of the material

19

evidence and verbal testimony presented against Petitioner at his trial to be both accurate and

20

substantial.   Given the significant independent evidence of Petitioner's guilt, the state court

21

reasonably determined that any error in the trial court's admission of  the statements made by Ms.

22

Pumar in the 911 call was harmless beyond a reasonable doubt.  By the same reasoning, any alleged

23

constitutional error involved in admitting Ms. Pumar's statements did not have a substantial or

24

injurious effect in determining the jury's verdict.

25

Petitioner is not entitled to federal habeas corpus relief on this claim.

26

17

**B. PROSECUTORIAL MISCONDUCT**

Petitioner alleges that the prosecutor committed prejudicial misconduct when he improperly disparaged defense counsel and implied that defense counsel did not believe her client's defense in his closing and rebuttal closing statements.

First, the prosecutor commented as follows during his closing statement:

| | |
|---|---|
| [PROSECUTOR]: | The first thing I want to address with you, everybody, is this race issue. And you're gonna hear it. And it frustrates me because every time you have a white person identifying a black person the defense has got to argue race, race, race. |
| [DEFENSE COUNSEL]: | Objection.  Objection, Your Honor. That's inappropriate. |
| THE COURT: | Okay. Overruled. Go ahead. |
| [PROSECUTOR]: | You hear it in all the media all the time.  That tends to tell you all that white people can't tell black people apart and vice versa.  That's not true. All right?  There may be some people in the community that think that, but that's not true. |
| | So rely on the other factors in this case that you've heard about, okay?  Don't just base this on race because that's not what it is. |

(Lodged Doc. 9 at 365).

Following closing statement by defense counsel, the prosecutor then made the following comments during his rebuttal closing statement:

| | |
|---|---|
| [PROSECUTOR]: | Look folks, I like her.  I like [defense counsel]. |
| [DEFENSE COUNSEL]: | Objection, Your Honor. |
| [PROSECUTOR]: | I know you like her, too, folks. |
| [DEFENSE COUNSEL]: | Objection.  Relevance. |

18

| | |
|---|---|
| THE COURT: | It's argument. Go ahead, [prosecutor]. |
| [PROSECUTOR]: | She's easy to like. All right? She is. I'm not saying that to put on an act. She is. A lot of likeable well-spoken attorneys have guilty clients, okay? The job of the defense attorney -- and I'm sure she would agree with me -- is to protect constitutional rights. That's what we're dealing with here. Constitutional rights. |
| | Every case that's ever filed against a Defendant in any state in this country is based upon constitutional rights. She has a job to do, it is to protect the man sitting to her left no matter what the circumstances, no matter how bad the evidence is. I should say how strong the evidence is against her client. |
| | She's got to make something up no matter what the circumstances are out of what she has. She has to come up with the defense. And what do you think it was in this case? I would never come up here and tell you folks that racism doesn't exist in this country or this city. I would never say that. |
| | But what I'm trying to make clear to you all is that it is so easily becomes the default defense if there was nothing else to hang your hat on getting to a conviction in this case but that he's a black man, and they identified a black man, and there was some other showing of impropriety or race, then use race as your defense or as an issue to hang home. |

(Lodged Doc. 9 at 400-401).

On habeas corpus review, the narrow standard of due process applies to claims of prosecutorial misconduct. *Darden v. Wainwright*, 477 U.S. 168, 181 (1986). A prosecutor's error or misconduct does not, per se, violate a criminal defendant's constitutional rights. *See Jeffries v.*

1    *Blodgett*, 5 F.3d 1180, 1191 (citing *Darden*, 477 U.S. at 181; *Cambell v. Kincheloe*, 829 F.2d 1453,

2    1457 (9th Cir. 1987)).  A defendant's due process rights are violated only if the error or misconduct

3    renders the trial fundamentally unfair.  *Darden*, 477 U.S. at 181.

4           In considering claims of prosecutorial misconduct involving allegations of improper

5    argument, the court is to examine the likely effect of the statements in the context of the entire

6    proceedings in which they were made and determine whether they so infected the trial with

7    unfairness as to make the resulting conviction a denial of due process. *Turner v. Calderon,* 281 F.3d

8    851, 868 (9th Cir. 2002); *Sandoval v. Calderon,* 241 F.3d 765, 778 (9th Cir. 2001).  Factors to be

9    considered in determining whether habeas corpus relief is warranted on a claim alleging improper

10   prosecutorial argument include whether the prosecutor manipulated or misstated the evidence;

11   whether his comments implicated other specific rights of the accused; whether the objectionable

12   content was invited or provoked by defense counsel's argument; whether the trial court admonished

13   the jurors; and the weight of the evidence against the defendant. *Darden*, 477 U.S. at 181 (quoting

14   *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974).  Relief is limited to cases in which the

15   petitioner can establish that the misconduct resulted in actual prejudice. *Johnson v. Sublett*, 63 F.3d

16   926, 930 (1995) (citing *Brecht v. Abrahamson*, 507 U.S. 619, 637-38 (1993)).  In other words,

17   prosecutorial misconduct violates due process when it has a substantial and injurious effect or

18   influence in determining the jury's verdict. *See Ortiz-Sandoval v. Gomez*, 81 F.3d 891, 899 (9th Cir.

19   1996).

20          The California Court of Appeal, Third Appellate District, considered and rejected

21   Petitioner's claim on direct appeal, explaining its reasoning as follows:

22              "The applicable federal and state standards regarding prosecutorial
             misconduct are well established.  "'A prosecutor's . . . intemperate

23           behavior violates the federal Constitution when it comprises a pattern
             of conduct 'so egregious that it infects the trial with such unfairness

24           as to make the conviction a denial of due process.'"' [Citations.]
             Conduct by a prosecutor that does not render a criminal trial

25           fundamentally unfair is prosecutorial misconduct under state law only
             if it involves "'the use of deceptive or reprehensible methods to

26           attempt to persuade either the court or the jury.'"' [Citation.] (*People*

20

*v. Samayoa* (1997) 15 Cal.4th 795, 841.)  The prosecutor's good or bad faith is not at issue because the standard by which his or her conduct is evaluated is objective.  (*People v. Hill* (1998) 17 Cal.4th 800, 822-823; *People v. Alvarez* (1996) 14 Cal.4th 155, 213.)

"As a general rule a defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion--and on the same ground--the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety. [Citation.]" (*People v. Samayoa, supra,* 15 Cal.4th at p.841.) "[O]therwise, the point is reviewable only if any admonition would not have cured the harm caused by the misconduct. [Citation.]" (*People v. Price*, (1991) 1 Cal.4th 324, 447, superseded by statute as stated in *People v. Hinks*, (1997) 58 Cal.App.4th 1157.)

Defendant claims the quoted comments of the prosecutor were prejudicial misconduct because "defense counsel's argument that the prosecution's witnesses were unable or unwilling to distinguish individuals among members of another race was unsupported by facts and inferences from the record.  It was misconduct for the prosecutor to argue to the jury that defense counsel did not fully accept and believe her client's case.  The prosecutor disparaged defense counsel in front of the jury, falsely claimed that she had injected the issue of race, and implied that it was common knowledge that defense attorneys always present that defense.  He also offered his personal opinion and belief that [defendant] was guilty."

A prosecutor commits misconduct by accusing defense counsel of fabricating a defense, suggesting defense counsel is free to deceive the jury, or otherwise attacking the integrity of defense counsel. (*People v. Bemore* (2000) 22 Cal.4th 809, 846; *People v. Hill, supra,* 17 Cal.4th 800, 832.)  It is misconduct for a prosecutor to argue that defense counsel does not believe in his or her client's defense (*People v. Thompson* (1988) 5 Cal.3d 839, 848.)  However, a prosecutor "has wide latitude in describing the deficiencies in opposing counsel's tactics and factual account." (*People v. Bemore, supra,* at p. 846; see *People v. Medina* (1995) 11 Cal.4th 694, 759.) "An argument which does no more than point out that the defense is attempting to confuse the issues and urges the jury to focus on what the prosecution believes is the relevant evidence is not improper. [Citation.]" (*People v. Cummings* (1993) 4 Cal.4th 1233, 1302, fn. 47.)  The prosecution may "vigorously attack the defense case and argument if that attack is based on the evidence." (*Peopel v. Hillhouse* (2002) 27 Cal.4th 469, 502.)

Defendant objected to only two of the comments by the prosecutor quoted above: (1) to the comment that race was always argued as a defense anytime a [W]hite person identifies a Black person, and (2) to the comment that the prosecutor liked, and thought the jury liked, defense counsel.  Defendant did not object to the prosecutor's later comments regarding the nature of defense counsel's job.  The

21

1

prosecutor made no comments expressing personal belief in defendant's guilt.

2

The prosecutor first commented that race was always being asserted as a defense anytime a White person identifies a Black person. This comment, particularly when considered in the context of the prosecutor's later comments directing the jury to base its decision on factors in the case other than just race, was essentially urging the jury to consider the evidence at trial. The prosecutor cautioned the jury not to be persuaded by defendant's anticipated argument based on race.[5] It was not prosecutorial misconduct.

3

4

5

6

7

The prosecutor's comment that he liked and thought the jury liked defense counsel did not denigrate defense counsel, quite the contrary. The prosecutor was simply making the point that the personalities of counsel were not at issue and the fact that counsel was likeable had no relevance to defendant's guilt or innocence. The comment was not prosecutorial misconduct.

8

9

10

Where the prosecutor strayed onto potentially dangerous ground was in his argument that defense counsel was required to "make something up no matter what the circumstances are" and by his following comments implying that defense counsel would assert race as a defense regardless of its support in evidence. However, defense counsel did not object to that portion of the argument. We conclude an objection and an admonition would have adequately cured any harm. Therefore, any misconduct in these comments is not open to review. (*People v. Price, supra,* 1 Cal.4th at p.447.)

11

12

13

14

15

(Lodged Doc. 3 at 17-20).

16

The state appellate court's rejection of Petitioner's claim was not contrary to or an

17

unreasonable application of clearly established federal law. The state appellate court's

18

characterizations of the prosecutor's arguments were reasonable, and for the reasons set forth by the

19

state appellate court, the prosecutor's arguments did not render Petitioner's trial fundamentally

20

unfair in violation of his federal due process rights. In fashioning closing arguments, prosecutors

21

are allowed "reasonably wide latitude," *United States v. Birges*, 723 F.2d 666, 671-72 (9th Cir.

22

1984), and are free to argue "reasonable inferences from the evidence." *United States v. Gray*, 876

23

24

25

26

---

[5] Defense counsel opted not to present any witnesses at trial, instead relying on the sufficiency of evidence presented by the prosecution. It appears that the prosecutor anticipated that defense counsel would argue the questionable reliability of witness cross racial identification based on counsel's cross examination of witnesses presented by the prosecution.

F.2d 1411, 1417 (9th Cir. 1989).  "[Prosecutors] may strike 'hard blows,' based upon the testimony and its inferences, although they may not, of course, employ argument which could fairly be characterized as foul or unfair."  *United States v. Gorostiza*, 468 F.2d 915, 916 (9th Cir. 1972).

More importantly, even if the prosecutor's comments amounted to error of a constitutional magnitude, a harmless error analysis ensues.  Here, Petitioner has failed to demonstrate prejudice on his prosecutorial misconduct claim.  As summarized in the above subsection, the material evidence and verbal testimony presented against Petitioner at his trial was substantial.  Thus, viewed in the context of the trial as a whole, it cannot be determined that the prosecutor's arguments had a substantial and injurious effect or influence on the jury's verdict, or that there is a reasonable probability that the results of his trial would have been different absent the alleged improper prosecutorial arguments.[6]

Petitioner is not entitled to federal habeas corpus relief on this claim.

**C. JURY TRIAL**

Petitioner claims that the imposition of the upper term sentence of three years on count one, grand theft from DeVon's Jewelers, violated his right to a jury trial because his jury conviction on that count did not establish all of the aggravating factors found true by the sentencing court.  According to Petitioner, the sentencing court violated his rights under the Sixth and Fourteenth Amendment by imposing an upper term sentence based on its own findings of aggravating factors not submitted to the jury and proven beyond a reasonable doubt nor admitted by Petitioner.  *See Cunningham v. California*, 549 U.S. 270 (2007); *Blakely v. Washington*, 542 U.S.

---

[6] The state appellate court found, as respondent now argues, that a portion of Petitioner's prosecutorial misconduct claim is subject to a procedural bar because of the failure of his trial counsel to raise a contemporaneous objection to the prosecutor's closing argument.  Without reaching the question of whether the procedural bar is applicable to any portion of Petitioner's claim, the claim should be rejected in its entirety due to Petitioner's failure to demonstrate prejudice.  *See Coleman v. Thompson*, 501 U.S. 722, 729 (1991) (Even if a claim may be rejected based on an adequate and independent state rule, such as procedural bar, the claim may be reviewed by a federal court if the petitioner can show (1) cause for the default and actual prejudice as a result of the alleged violation of federal law; or (2) that failure to consider the claim will result in a fundamental miscarriage of justice).

296 (2004); *Apprendi v. New Jersey*, 530 U.S. 466 (2000).

A criminal defendant is entitled to a trial by jury and to have every element necessary to sustain his conviction proven by the state beyond a reasonable doubt.  U. S. Const. Amends. V, VI, XIV.  "Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury and proved beyond a reasonable doubt."  *Blakely v. Washington*, 542 U.S. 296, 301 (2004) (citing *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000).  "The 'statutory maximum' for *Apprendi* purposes is the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant.*"  *Id.* at 303-304 (emphasis in original).  In other words, the "statutory maximum" for purposes of this constitutional rule:  "is not the maximum sentence a judge may impose after finding additional facts, but the maximum he may impose *without* any additional findings."  *Id.* at 304 (emphasis in original).  Subsequent to Petitioner's sentencing, the United States Supreme Court held that California's Determinate Sentencing Law ("DSL") violated a defendant's right to a jury trial to the extent that it allowed a trial court to impose an upper term sentence based upon facts found by the sentencing court rather than the jury.  *Cunningham v. California*, 549 U.S. 270 (2007)  The *Cunningham* Court also determined that the middle term under the DSL is the maximum term that may be imposed on the basis of the jury's verdict alone.  *Id.* at 288.  The Ninth Circuit has held that *Cunningham* must be applied retroactively on collateral review.  *Butler v. Curry*, 528 F.3d 624, 639 (9th Cir. 2008).

In this case, the sentencing court sentenced Petitioner to the upper statutory term of three years on count one based on consideration of the following:

> Well, Mr. Mark, you and I are the same age, both 46, and you [have] got the longest rap sheet I think I've ever seen as a judge.  And there are priors that you have that were not alleged, but you just [have] got a very, very lengthy history, and I think, you know, part of looking at you and what I should do, it strikes me that many years ago, you know, somebody should have sent you to CRC or done something else.

> But the fact of the matter is there have [sic] been a lot of research

24

done in the [sic]drug addiction and how do we actually help people that are drug addicted. And the fact of the matter is, whether I force you to go into rehab or if you go in voluntarily, the benefits of drug treatment are the same, which I think is very surprising.

I always thought that, you know, if somebody willingly goes into drug treatment, their chances of getting over that addition are greater. But the fact of the matter is it's the same. It's the same failure or the same success, depending on whether you view the glass half empty or half full.

Those that are forced into drug treatment are just as likely to reoffend as those that go in willingly. So, well, whether I send you to CRC or not, the bottom line is what do you do with yourself, and, you know, what do you do as a man to change your behavior?

And I - - as I look at your criminal record, it strikes me that I don't think the criminal justice system has done you any favor by really giving you a wink and a nod every time you've cycled through. You've been treated very leniently. You really have. And the only thing that I can think as you sit here right now is as a 46-year-old man, that perhaps the long stint in prison will give you a chance to dry out and to overcome this addiction.

I don't know if it will or if it won't. I also don't know if drug treatment in your situation is gonna work or not. I see that you have a very supportive family, and, you know, you said that your mom did a good job at raising you, and I'm sure she did. And this has got to be a very disappointing thing for her.

But I just at this point in time, Mr. Mark, I think it would be inappropriate for me to strike your priors. I've considered it. I've looked at the circumstances surrounding this offense. I'm not punishing you for exercising your constitutional right. You have every right to come into court and mount a defense, and your attorney did an excellent job for you.

As I've indicated, you've been a perfect gentleman through the course of these proceedings. I have you know no ill feelings toward you. In fact, I think you've been a real gentleman, and I hope you're able to overcome this addition, and I hope you take the time that I'm going to give you in prison to do that. And the [sic] extent that you're able to voluntarily attend Narcotics Anonymous course, I would hope that you would take the opportunity to do that. Okay?

So the Defendant - - you are not eligible for probation pursuant to section 1203(e)(4) unless I find unusual circumstances warranting a grant of probation. And I cannot find any unusual circumstances in your case. There are a number of factors in aggravation, but for the purposes of the record - - and I know, [Defense Counsel], you did make this clear in the beginning of the case, I assume that you want

to preserve any Blakely issue?

[DEFENSE COUNSEL]:     Yes, Your Honor, I do.  I apologize.  I am objecting to any upper term imposed by the Court under Blakely.

Okay.  What the Court is going to impose is the upper term based on two divergent views.  First, I do find that the circumstance in aggravation far outweigh any circumstance in mitigation.  I do find that the crimes as carried out involved a certain amount of planning, sophistication and professionalism.  That the Defendant's prior convictions as an adult and sustained petitions in juvenile delinquency proceedings are numerous.

And in that regard I am not using the prior convictions for purposes of those alleged in the Information as the Court's basis in making this finding, instead the Court relies upon the following prior convictions to aggravate the term:

The October 5th, 1985, conviction for petty theft, [and] theft with a prior; the August 6th, 1987, conviction for 11355; the 1992 petty theft conviction; the December 13th, 1993 grand theft conviction.  So that it is clear there is no dual use of facts involved in the Court's analysis.

The Defendant was also on parole at the time these crimes were committed, and the Defendant's prior performance on parole has been unsatisfactory.  I do not find any circumstances in mitigation.

So that it is the judgment and sentence of this Court as to count one, for violating Penal Code Section 487(a), the Defendant will be committed to State Prison for the upper term of three years.

(Lodged Doc. 9 at 428-431).

Thus, Petitioner was sentenced to the upper term of three years on his conviction for grand theft from DeVon's Jewelers based on the sentencing court's finding that the aggravating factors in Petitioner's case outweighed the mitigating factors.  Specifically, the court found that factors weighing in aggravation included that (1) the crime involved planning, sophistication and professionalism; (2) Petitioner's prior convictions as an adult and his sustained petitions in juvenile delinquency proceedings, separate and apart from the convictions alleged in the information, were numerous; (3) Petitioner was on parole at the time of the crime; and (4) Petitioner's prior performance on parole was unsatisfactory.  The court found no mitigating factors.

The California Court of Appeal, Third Appellate District, considered and rejected Petitioner's claim that imposition of the upper term violated his right to a jury trial on direct appeal, explaining its reasoning as follows:

> Defendant claims the trial court violated his federal constitutional rights to jury trial and due process when it sentenced him to the upper term of three years for count one, the grand theft from DeVon's Jewelers, in violation of *Apprendi v. New Jersey* (2000) 530 U.S. 466 [147 L.Ed.2d 435], *Blakely v. Washington* (2004) 542 U.S. 296 [159 L.Ed.2d 403], and *Cunningham, supra,* 549 U.S. __ [166 L.Ed. 856]. We disagree.

> Over the defendant's objection pursuant to *Blakely v. Washington, supra,* 542 U.S. 296 [159 L.Ed.2d 403], the trial court imposed the upper term for count one based on the findings that the crimes involved planning, sophistication and professionalism, that defendant's prior convictions (separate and apart from the prior convictions used as the basis for the enhancement allegations) are numerous, that defendant was on parole at the time these crimes were committed, and that defendant's prior performance on parole had been unsatisfactory.

> Applying *Cunningham*, our Supreme Court recently held in *People v. Black* (2007) 41 Cal.4th 799, 816 (*Black II*) that "imposition of the upper term does not infringe upon the defendant's constitutional right to jury trial so long as one legally sufficient aggravating circumstance has been found to exist by the jury, has been admitted by the defendant, or is justified based upon the defendant's record of prior convictions."

> Here, the record discloses at least one legally sufficient aggravating circumstance that is justified based upon defendant's record of prior convictions. The trial judge found the aggravating circumstances that defendant's "prior convictions as an adult and sustained petitions in juvenile delinquency proceedings are numerous." The trial court then specifically identified five prior convictions separate from those alleged in the information on which it was relying. (See *People v. Searle* (1989) 213 Cal.App.3d 1091, 1098 [three prior convictions deemed numerous]; see also *Black II, supra,* 41 Cal.4th at p. 818 [citing *Searle* with approval on this point and concluding five prior convictions were numerous]; Cal. Rules of Court, rule 4.421(b)(2) [defining an aggravating circumstance as including the circumstance of numerous prior convictions].) Consequently, under *Black II*, the trial judge's imposition of the upper term did not violate defendant's constitutional right to jury trial (and related due process rights) under *Apprendi/Blakely/Cunningham*.

> Although defendant disagrees with the reasoning of *Black II*, we are bound by it. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57

1    Cal.2d 450, 455.)

2    (Lodged Doc. 3 at 20-22).

3            The decision of the state appellate court is not contrary to or an unreasonable

4    application of clearly established law.  Petitioner argues that all aggravating factors found by the

5    court to support its imposition of the upper term sentence in his case must have been presented to

6    a jury and proven beyond a reasonable doubt.  He is mistaken.  Under California law, only one

7    aggravating factor is necessary to set the upper term as the maximum sentence.  *People v. Black*, 41

8    Cal.4th 799, 805 (2007) ("*Black II*").  *See also Butler*, 528 F.3d at 641-43; *People v. Cruz*, 38

9    Cal.App.4th 427, 433 (1995) (*People v. Forster*, 29 Cal.App.4th 1746, 1758 (1994).  Here, the fact

10   of petitioner's five prior convictions alone authorized imposition of the upper term.[7]  Unlike other

11   aggravating circumstances, it is clear that *Apprendi, Blakely and Cunninham* clearly establish that

12   the fact of a criminal defendant's prior conviction need not be submitted to a jury and proved beyond

13   a reasonable doubt in order for it to be relied upon during sentencing.  *Apprendi*, 530 U.S. at 490;

14   *Blakely,* 542 U.S. at 301; *Cunningham*, 549 U.S. at 288-89.  *See also United States v. Delaney*, 427

15   F.3d 1224, 1226 (9th Cir. 2005) ("The Supreme Court has made clear that the fact of a prior

16   conviction need not be proved to a jury beyond a reasonable doubt or admitted by the defendant to

17   satisfy the Sixth Amendment.") (citation omitted); *United States v. Martin*, 278 F.3d 988, 1006 (9th

18   Cir. 2002) ("*Apprendi* expressly excludes recidivism from its scope.  Defendant's criminal history

19   need not be proved to a jury beyond a reasonable doubt." (citations omitted).).  Any additional fact

20   finding done by the sentencing court was relevant only to the selection of a sentence within the

21   range authorized by statute.  *See Butler*, 528 F.3d 624 (9th Cir. 2008) ("The Sixth Amendment does

22   not prevent judges from 'exercis[ing] discretion-taking into consideration various factors relating

23

24            [7] Petitioner also claims that the court improperly relied upon his sustained petitions in
25   juvenile delinquency proceedings as an aggravating factor because such proceedings do not provide
     the same procedural safeguards as a jury trial.  However, it is not necessary to reach this question.
26   The sentencing court was careful to state exactly which convictions it relied upon in imposing the
     upper term sentence, and a review of the record reveals that all of the relied upon convictions
     occurred after Petitioner's eighteenth birthday.

to both the offense and offender in imposing a judgment *within the range* prescribed by statute.'") (emphasis in original) (quoting *Apprendi*, 530 U.S. at 481)).

Under these circumstances, Petitioner's upper term sentence imposed on his conviction for grand theft from DeVon's Jewelers is not unconstitutional because at least one of the aggravating factors, Petitioner's prior convictions, relied upon by the sentencing court was established in a manner consistent with the Sixth Amendment. *Butler*, 528 F.3d at 643 (Imposition of an upper term sentence under the Determinate Sentencing Law based on a valid aggravating factor is permissible under *Cunningham*, even when the trial court relies on other aggravating factors that would not support the upper term sentence. Accordingly, Petitioner is not entitled to federal habeas corpus relief on this claim.

## VI.  CONCLUSION

For the foregoing reasons, the petition for writ of habeas corpus is hereby DENIED. If Petitioner wishes to appeal this decision, a certificate of appealability must issue. 28 U.S.C. § 2253(c); FED. R. APP. P. 22(b). A certificate of appealability may issue under 28 U.S.C. § 2253 "if the applicant has made a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2). The certificate of appealability must "indicate which specific issue or issues satisfy" the requirement. 28 U.S.C. § 2253(c)(3). A certificate of appealability should be granted for any issue that Petitioner can demonstrate is "'debatable among jurists of reason,'" could be resolved differently by a different court, or is "'adequate to deserve encouragement to proceed further.'" *Jennings v. Woodford*, 290 F.3d 1006, 1010 (9th Cir. 2002) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 (1983)). In this case, Petitioner failed to make a substantial showing with respect to any of the claims presented. A certificate of appealability is therefore DENIED. *See* 28 U.S.C. § 2253(c)(2).

IT IS SO ORDERED.

DATED: July 27, 2011

*Charlene H. Sorrentino*

CHARLENE H. SORRENTINO
UNITED STATES MAGISTRATE JUDGE